12 CIV 1025

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

ELLEN GELBOIM, on behalf of herself
and all others similarly situated,

                  Plaintiffs,

    -against-

CREDIT SUISSE GROUP AG, BANK
OF AMERICA CORPORATION, J.P.
MORGAN CHASE & CO., HSBC
HOLDINGS PLC, BARCLAYS BANK
PLC, LLOYDS BANKING GROUP PLC,
WESTLB AG, UBS AG, ROYAL BANK
OF SCOTLAND GROUP PLC,
DEUTSCHE BANK AG, CITIBANK
NA, RABOBANK GROUP, THE
NORINCHUKIN BANK, BANK OF
TOKYO-MITSUBISHI UFJ, SOCIETE
GENERALE, and ROYAL BANK OF
CANADA,

                  Defendants.

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



FEB 9 2012
U.S.D.C. S.D. N.Y.
CASHIERS

1.    Plaintiff Ellen Gelboim ("Plaintiff"), by her undersigned attorneys, brings this action against Defendants based on their conspiracy to manipulate the London Interbank Offered Rate ("Libor") in violation of the Sherman Act, 15 U.S.C. § 1. She brings this action for herself and on behalf of all others who owned (including beneficially in "street name") any debt security: (a) that was issued by any Fortune 500 company; (b) on which interest was paid at any time between January 1, 2006 and December 31, 2010 (the "Class Period"); (c) where that interest was paid at a rate expressly linked to the U.S. Dollar Libor rate ("LIBOR"[1]); and

---

[1] As used herein, "LIBOR" refers to the U.S. Dollar Libor rate, whereas "Libor" refers to all Libor rates, generally.

(d) that was underwritten, exclusively or with others, by any of the defendant banks identified below. These debt securities are collectively referred to herein as the "Relevant LIBOR-Based Debt Securities."

2.　　Plaintiff's allegations as to herself and her own actions are based upon personal knowledge, and as to all other matters, upon information obtained during the course of her attorneys' investigation, including, but not limited to, the analysis and review of: (a) public news reports concerning pending investigations of manipulation in the Libor by the Securities and Exchange Commission, U.S. Department of Justice, British regulatory authorities and the Japanese Financial Supervisory Agency; (b) fixed income market commentary; (c) academic articles and writings; (d) other public reports of the information alleged herein; and (e) upon belief, as set forth below.

3.　　Defendants conspired to and did depress and manipulate LIBOR during the Class Period.

4.　　Libor is a daily benchmark interest rate that is widely used in the financial industry and in commerce generally in setting interest rates in transactions.

5.　　Libor is administered by the British Bankers Association ("BBA"). The BBA is a trade association for the United Kingdom ("UK") banking and financial services sector that advocates on behalf of its more than 200 member banks from 60 countries on a full range of UK and international banking issues. The majority of the defendant banks are members of the BBA.

2

6.      Libor is calculated for ten different currencies[2] and reflects the average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.

7.      Daily by 11:10 a.m. London time, the individual banks on the various currency panels transmit to Thompson Reuters Group ("Reuters"), a news information provider, data reflecting what it would cost them to "borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time." Each day, Reuters publishes the average rates based on an established formula (described below), which rates become that day's Libor rates for each currency and maturity.

8.      At all relevant times prior to February 2011, sixteen banks participated in the U.S. Dollar LIBOR panel (the "Panel Banks"). During this period, Reuters arrived at the published LIBOR rate by excluding the lowest four and highest four of the reported estimates, and then calculating the average of the remaining eight reported rates for each maturity. In February 2011, the size of the U.S. Dollar LIBOR panel was increased to twenty banks. Since then, Reuters calculates the daily U.S. Dollar LIBOR by eliminating the five highest and five lowest reported rates and then averaging the remaining ten reported rates for each maturity.

9.      Throughout the Class Period, Defendants were Panel Banks. Pursuant to their illegal conspiracy detailed herein, in order to depress and manipulate LIBOR, Defendants knowingly and purposely submitted to Reuters borrowing rates that were below the true borrowing costs these banks were required, or would have been required, to pay.

10.     This scheme to manipulate LIBOR was devised and executed by Defendants in order, *inter alia*, to benefit their financial positions. Specifically, Defendants were motivated to,

---

[2] The currencies for which Libor rates are reported include the Australian, Canadian, and U.S. dollars, the U.K Pound Sterling, the Euro, the Japanese Yen, and the Swedish Krona.

and did act to manipulate and artificially depress reported LIBOR rates in order, *inter alia*, to create the appearance of financial strength and not reveal to the market their true respective financial conditions.

11.     As a direct result of Defendants' manipulation of LIBOR, the LIBOR rates reported by Reuters during the Class Period were artificially manipulated and lower than they would have been absent such manipulation. As set forth herein, Defendants' conspiracy to depress LIBOR violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     Plaintiff and members of the Class suffered damages by, *inter alia*, receiving manipulated and artificially depressed amounts of interest on Relevant LIBOR-Based Debt Securities they owned during the Class Period, as more fully alleged herein.

## PARTIES

13.     Plaintiff Ellen Gelboim ("Plaintiff") purchased and/or owned a Relevant LIBOR-Based Debt Security during the Class Period and received artificially depressed amounts of interest on the security as the result of Defendants' misconduct.

14.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in offices in Zurich, Switzerland. At all relevant times, Credit Suisse was a Panel Bank.

15.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. At all relevant times, Bank of America was a Panel Bank.

16.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a Delaware financial holding company headquartered in New York, New York. At all relevant times, J.P. Morgan was a Panel Bank.

4

17.    Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England.  At all relevant times, HSBC was a Panel Bank.

18.    Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England.  At all relevant times, Barclays was a Panel Bank.

19.    Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB").  At all relevant times, HBOS, Lloyds TSB, and/or Lloyds were Panel Banks.

20.    Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.  At all relevant times, WestLB was a Panel Bank.

21.    Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.  At all relevant times, UBS was a Panel Bank.

22.    Defendant Royal Bank of Scotland Group plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  At all relevant times, RBS was a Panel Bank.

23.    Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt Germany.  At all relevant times, Deutsche Bank was a Panel Bank.

24.    Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York. At all relevant times, Citibank was a Panel Bank.

5

25.     Defendant Rabobank Group ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands.  At all relevant times, Defendant Rabobank was a Panel Bank.

26.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan.  At all relevant times, Norinchukin was a Panel Bank.

27.     Defendant Bank of Tokyo-Mitsubishi UFJ ("Mitsubishi") is a subsidiary of Mitsubishi UFJ Financial Group, Inc., and is headquartered in Tokyo, Japan.  At all relevant times, Mitsubishi was a Panel Bank.

28.     Defendant Societe Generale ("SocGen") is a major European financial services company, and is headquartered in Paris, France.  At all relevant times, SocGen was a Panel Bank.

29.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada, and is headquartered in Toronto, Canada.  At all relevant times, RBC was a Panel Bank.

30.     Defendants Credit Suisse, Bank of America, J.P. Morgan, Barclays, HSBC, Barclays, Lloyds, WestLB, UBS, RBS, Deutsche Bank, Citibank, Rabobank, Norinchukin, Mitsubishi, SocGen, and RBC are referred to herein collectively as the "Defendants."

## UNNAMED CO-CONSPIRATORS

31.     Various other entities and individuals not named as defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

32.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

33.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26a.

34.     Venue is proper in the Southern District of New York pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. §§ 1391(b), (c), and (d). One or more of the Defendants resided, transacted business, were found, or had agents in the District, a substantial part of the events giving rise to Plaintiff's claims arose in the District, and a substantial portion of affected interstate trade and commerce described herein has been carried out in this District.

## SUBSTANTIVE ALLEGATIONS

### I.     Overview of Libor

35.     Libor is a set of reference or benchmark interest rates applicable to different periods to maturity, from overnight to one year.  Libor rates are published daily for ten different currencies.  Libor is intended to reflect accurately the average interest rate that reporting banks would have to pay for an unsecured loan for a designated maturity period in a specified currency.

36.     The BBA's Foreign Exchange and Money Market Committee, which is responsible for overseeing the calculation of Libor,  defines it as: "The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting interbank offers in reasonable market size, just prior to 11:00 London time."  The rates reported by each bank that is a member of a currency panels must be consistent with the following prerequisites:

a.      Reported rates must be formed from that bank's perception of its own cost of unsecured funds in the inter-bank market.  This will be based on the cost of funds not covered by any government guarantee scheme.

7

b. Reported rates must represent rates at which a bank would be offered funds in the London Money Market and not elsewhere.

c. Reported rates must be for the currency concerned, not the cost of producing one currency by borrowing in another currency and accessing the required currency via the foreign exchange markets.

d. Reported rates must be submitted by a bank's staff members with primary responsibility for management of the bank's cash, rather than a bank's derivative book.

e. The definition of "funds" is: unsecured inter-bank cash or cash raised through primary issuance of inter-bank Certificates of Deposit.

37. LIBOR is calculated and published by Reuters after 11:00 a.m. (and generally around 11:45 a.m.) each day (London time). As noted above, during the Class Period, there were sixteen contributing banks on the U.S. Dollar LIBOR panel. The reported LIBOR interest rates published during the Class Period were the mean of the middle values (the inter-quartile mean), after exclusion of the lowest four and highest four rates for each reported maturity.

38. Persons and entities engaged in commerce in the United States commonly use the U.S. Dollar LIBOR as the benchmark for determining the interest rate on floating-rate obligations. Frequently the interest rates owed on such obligations are set as LIBOR plus a premium, which may be expressed in basis points[3] or percentage points. All Libor rates are quoted as an annualized interest rate. Thus, for example, if an overnight rate from a reporting bank were reported as 2.00%, that would mean that the bank would expect to pay the one day portion of an annual rate of 2.00%.

---

[3] A "basis point" equals 1/100th of 1%. Interest rates are commonly expressed in basis points in financial instruments, because daily rate changes are typically significantly smaller than 1%, though small changes can have material financial effects.

39.     As a benchmark, LIBOR serves a crucial role in the operation of the financial markets.  Market participants use LIBOR as a basis to determine the interest to be paid on short-term fixed-rate notes.  LIBOR affects trillions of dollars' worth of financial transactions, including the amounts of interest paid pursuant to Relevant LIBOR-Based Debt Securities.

## II.     Empirical Evidence Confirms that Defendants Depressed or Maintained at Artificial, Manipulated Levels their Reported LIBOR during the Class Period.

40.     During the Class Period, the Defendants and other unnamed co-conspirators artificially depressed, and collectively agreed to artificially depress the LIBOR rates below levels at which they would have been set had the Panel Banks accurately reported their true costs of borrowing.

41.     Beginning as early as 2006 and continuing during the Class Period, Defendants reported U.S. Dollar rates to Reuters that did not accurately reflect Defendants' true costs of borrowing.  Support for the existence of this widespread agreement and scheme to manipulate LIBOR rates includes both objective evidence of erratic and unprecedented behavior not explainable by unmanipulated market behavior, and academic studies that analyzed this behavior.

42.     Examples of unprecedented market behavior detailed below include the fact that during the Class Period, LIBOR shattered its historical relationships with various economic benchmarks, signifying that LIBOR was no longer representative of market forces, but rather reflected manipulation by the Defendants.  Moreover, LIBOR responded to public pressure when concerns for its erratic behavior were publicly reported, demonstrating that LIBOR had previously been intentionally manipulated by Defendants, as opposed to reflecting an objective report of market conditions.

43.     In addition, an examination of Defendants' LIBOR reports reveals inconsistencies with their reporting for other currencies, which further supports the fact that Defendants purposefully and collectively agreed to, and did, underreport their actual borrowing costs in order to artificially and unlawfully depress LIBOR.

44.     LIBOR's calculation is opaque, not transparent.  The LIBOR calculation is only transparent to the extent that each Panel Bank reports to Reuters its borrowing rate, and Reuters publicizes the rates and computes LIBOR.  The method by which each Panel Bank arrives at its reported borrowing rates is internal to it and not observable by the public.  This renders LIBOR susceptible to manipulation by Defendants.

45.     Empirical studies, undertaken by different academic and financial experts and analyzing different blocks of time during the Class Period, further demonstrate that there was aberrant behavior in reported LIBOR rates during the Class Period and that reported LIBOR rates were manipulated, thus supporting the existence of an agreement among Defendants to manipulate and depress LIBOR.

**A.     LIBOR Diverged from its Historical Relationship with the Eurodollar Rate.**

46.     The U.S. Dollar LIBOR measures the average interest rate Panel Banks expect to pay to borrow U.S. Dollars.  Dollar-denominated deposits and obligations held in non-U.S. banks are known as Eurodollars.[4]  Eurodollars are market traded,[5] and the market rate for Eurodollars is

---

[4] Because these deposits were originally largely held in Europe, they are known as Eurodollars, despite the fact that they are now held in many countries around the globe.  As these deposits are not located within the United States, Eurodollars are outside of the jurisdiction of the Federal Reserve.  The fact that Eurodollars are subject to fewer regulations allows them to earn higher margins.

commonly seen as an excellent market proxy for LIBOR. In the first of multiple studies and analyses, Connan Snider, an Economics Professor at UCLA, and Thomas Youle, an Economics Professor at the University of Minnesota, determined that, prior to August 2007, the previous day's Eurodollar bid rate was, ironically, a better predictor of LIBOR than the previous day's LIBOR rate.[6]

47.    Historically, the difference between LIBOR and the Eurodollar rate, known as LIBOR/Eurodollar spread (effectively LIBOR minus the Eurodollar bid rate), averaged 2.75 basis points. The spread was almost always positive, meaning the Eurodollar rate was slightly lower, reflecting the measurement of LIBOR as an offer rate and the Eurodollar rate as a bid rate on U.S. Dollar deposits. After August 2007, Defendants' manipulation and depression of LIBOR resulted in a decoupling of LIBOR and the Eurodollar rate, and a reversal of the longstanding historical relationship, resulting in an average spread of -24.70 basis points.

48.    The shift of the LIBOR/Eurodollar spread from its historically mildly positive relationship to a strongly negative one is illustrated in the chart below. This change in the historical relationship is evidence of the downward manipulation of LIBOR. In effect, LIBOR reported that banks were offering Eurodollars at a rate lower than market participants were actually buying them. This demonstrates that LIBOR was no longer reflective of market conditions, but instead was the product of Defendants' manipulation.

---

[5] The term Eurodollar also refers to the financial futures contracts traded on the Chicago Mercantile Exchange. Eurodollars are one of the most actively traded futures contracts in the world, making it a highly liquid market.

[6] Abstract entitled "Diagnosing the LIBOR: Strategic Manipulation and Member Portfolio Positions," December, 2009.



3 Month Eurodollar - U.S. Libor Spread

**B.     LIBOR Diverged from Its Historical Relationship with Credit Default Swaps.**

49.     A credit default swap ("CDS") is a swap contract and agreement in which one party, the protection buyer, seeks financial protection in the event of a default on an underlying credit instrument (typically a bond or loan).  Typically, the protection buyer of the CDS makes a series of payments (often referred to as the CDS "fee" or "spread") to the protection seller and, in exchange, receives a payment if the underlying credit instrument experiences an adverse credit event.  The spread serves as a measure of the perceived risk of default by the entity issuing the underlying bond or receiving the loan. The greater the risk of default on the underlying bond or loan, the greater the spread.  In the case of a CDS for which the underlying instrument is an interbank loan where a Panel Bank is the borrower, the greater the perceived risk that the Panel Bank will default on the loan, the higher the applicable CDS spread, as this higher spread represents the cost of insuring against a default on the underlying loan.

50.     CDSs are a useful benchmark for LIBOR, because both CDSs and LIBOR are a measure of perceived credit risks.  In a May 29, 2008, article in *The Wall Street Journal* (the "*WSJ*") entitled "Study Casts Doubt on Key Rate," Carrick Mollenkamp and Mark Whitehouse published the results of their analysis of significant disparities between Panel Banks' perceived

risk in the CDS market and their reported LIBOR rates during the first four months of 2008 Mollenkamp and Whitehouse compared the costs of insuring against a specific bank's defaulting on debt with the borrowing costs that the same bank reported to Reuters for inclusion in calculating LIBOR. As the *WSJ* article reported: "In order to assess the borrowing rates reported by the 16 banks, the Journal crunched numbers from another market that provides a window into the financial health of banks: the default-insurance market." Mollenkamp and Whitehouse found that those two costs had historically shifted together; "both rose when the market thought banks were in trouble." The authors determined that, beginning in January 2008, those metrics diverged. Amid growing anxiety over bank solvency, the cost of purchasing default insurance on certain banks rose, while, suspiciously, the same banks' reported borrowing costs showed no such reaction.

51.     The *WSJ* article identified Citibank, WestLB, HBOS, JP Morgan, and UBS as the banks with the widest divergence between their reported LIBOR rates and their more likely true borrowing costs, as evidenced by default insurance premium costs on their debt. According to the *WSJ* analysis, Defendant Citibank's reported rates differed the most from what the credit default market suggested. On average, the rates at which Citibank said that it could borrow dollars for three months (*i.e.*, its LIBOR rates) were about 87 basis points lower than the rate calculated using default-insurance data. The difference was 70 basis points for WestLB, 57 basis points for HBOS, 43 basis points for J.P. Morgan, and 42 basis points for UBS. The difference for Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and RBS was about 30 basis points. Mollenkamp and Whitehouse found that "one possible explanation for this gap is that banks understated their borrowing rates."

52.     In another example of suspicious conduct cited by the *WSJ*:

13

On the afternoon of March 1 0, 2008, for example, investors in the default-insurance market were betting that WestLB, which was hit especially hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse Group, a Swiss bank that was perceived to be in better shape. Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse

53.     David Juran, a statistics professor at Columbia University who reviewed Mollenkamp and Whitehouse's methodology, concluded that the calculations set forth in their *WSJ* article demonstrated "very convincingly" that reported LIBOR rates were lower than what the market thought they should be by a factor which well surpassed the threshold that statisticians use to assess the significance of a result.

54.     In their analysis, which followed Mollenkamp and Whitehouse, Snider and Youle performed two separate comparisons between LIBOR and CDSs that further highlighted inconsistencies in LIBOR reporting. First, Snider and Youle noted instances where a specific reporting bank had a comparatively higher CDS spread than a second reporting bank (indicating that the first bank was perceived as comparatively "risker"), while simultaneously reporting a lower LIBOR rate than the second bank (which would indicate that the first bank was perceived as a "less risky" investment). Reflecting this suspect phenomenon, Snider and Youle noted in their study that "Citi's quotes are, in fact, often considerably lower than its own CDS spreads." According to Snider and Youle, "this implies that there were interbank lenders willing to lend to Citigroup at rates which, after purchasing credit protection, would earn them a guaranteed 5 percent loss," a scenario they found not to be credible.

55.     Snider and Youle also compared reported LIBOR and CDS rates among Panel Banks. They found, for example, that Citigroup consistently had a substantially higher CDS spread than Mitsubishi, yet Citigroup reported comparatively lower LIBOR rates. Mollenkamp and Whitehouse had also noted the same pattern. Snider and Youle stated their belief that this

14

discrepancy indicated that Citibank likely under-reported its LIBOR rates in order to appear

more creditworthy than its CDS spread indicated it was.

56.     On May 29, 2008, *Bloomberg* reported the admission by Barclays Capital strate-

gist Tim Bond that banks "routinely" misstated interest rates to the BBA:

> Banks routinely misstated borrowing costs to the British Bankers' Association to
> avoid the perception that they faced difficulty raising funds as credit markets
> seized up, said Tim Bond, a strategist at Barclays Capital.
>
> "The rates the banks were posting to BBA became a little bit divorced from reali-
> ty," Bond, head of asset-allocation research in London, said in a Bloomberg Tele-
> vision interview. "We had one week in September where our treasurer, who takes
> his responsibilities pretty seriously, said: 'right, I've had enough of this, I'm go-
> ing to quote the right rates.' All we got for our pains was a series of media arti-
> cles saying that we were having difficulty financing."

57.     The *Bloomberg* article specifically singled out Defendant UBS as a LIBOR-

setting bank whose rate submissions painted a far rosier picture of its stability than its many dire

financial disclosures in that time period indicated:

> As well as varying from member to member, rates show little correlation to
> banks' costs of insuring debt from default. UBS AG, whose default-insurance
> costs rose 919 percent between July 2 and April 15 as it racked up $38 billion of
> writedowns and losses, quoted dollar-borrowing costs that were lower than its ri-
> vals on 85 percent of the days during that period, Bloomberg data shows.

58.     Further reflecting this unprecedented disconnect between LIBOR and CDS rates,

on June 2, 2008, the *Financial Times* reported that:

> The rate of borrowing in Libor has lagged behind other market-based measures of
> unsecured funding used by the vast majority of financial institutions. This has
> aroused suspicions that the small group of banks which supply the BBA with Li-
> bor quotes have understated true borrowing costs so as not to fan fears they have
> funding problems.

## C.   LIBOR Diverged from Its Historical Relationship with the Federal Reserve Auction Rate.

59.     Evidence of the artificial manipulation of LIBOR also is found in the comparison of LIBOR with federal funds rates.  For example, in an April 16, 2008 *WSJ* article, Mollenkamp noted that the Federal Reserve had recently auctioned off $50 billion in one-month loans to banks, for an average annualized interest rate of 2.82%, which was 10 basis points higher than the comparable LIBOR rate.  This differential makes no economic sense if the reported LIBOR rate was accurate.  As Mollenkamp noted: "Because banks put up securities as collateral for the Fed loans, they should get them for a lower rate than Libor, which is riskier because it involves no collateral."

60.     In another *WSJ* article, entitled "Libor's Accuracy Becomes Issue Again," published on September 24, 2008, Mollenkamp raised further concerns about LIBOR's accuracy based on the comparison of the rate for the 28-day Federal Reserve auction and the one-month U.S. Dollar LIBOR rate.  According to the article, because the Federal Reserve requires collateral:

> banks should be able to pay a lower interest rate [to the Fed] than they do when they borrow from each other [*e.g.*, LIBOR] because those loans are unsecured.  It is the same reason why rates for a mortgage, which is secured by a house, are lower than those for credit cards, where the borrower doesn't put up any collateral. In other words, the rate for the Fed auction should be lower than Libor.

> But on Monday, the rate for the 28-day Fed facility was 3.75%, which was much higher than Libor.  On Monday, the one-month dollar Libor rate was 3.19%[7] while Tuesday's rate was 3.21%.

---

[7] The *WSJ* subsequently corrected the actual one-month LIBOR rate for Monday to 3.18%.

**D.    LIBOR Diverged from Its Historical Relationship with Overnight Index Swaps.**

61.    In an academic article analyzing LIBOR rates for the second half of 2007 and 2008,[8] Justin Wong offered another measure for "Libor's confused correlation," namely, the spread between LIBOR and the Overnight Index Swap (OIS) rate:

> Between 2001 and July 2007, when the global credit crisis began, the spread averaged eleven basis points. In July 2008, the gap between LIBOR and the OIS approached 100 basis points, a figure significantly lower than the spread from a year prior. In October 2008, it peaked at 366 basis points, then receded somewhat in November 2008 to 209 basis points, far above the pre-crisis level.

**E.    Inconsistencies within LIBOR Reporting by Individual Banks**

**(i)    Panel Banks Reported Suspiciously Similar Rates.**

62.    The May 29, 2008 *WSJ* article by Mollenkamp and Whitehouse further showed that Panel Banks reported remarkably similar borrowing costs, despite the fact that they were facing significantly different financial stresses. As reported in their *WSJ* article, Mollenkamp and Whitehouse found: "At times of market turmoil, banks face a dilemma. If any bank submits a much higher rate than its peers, it risks looking like it's in financial trouble. So banks have an incentive to play it safe by reporting something similar – which would cause the reported rates to cluster together."

63.    Based upon their analysis, Mollenkamp and Whitehouse reported that "during the first four months of 2008, the three-month borrowing rates reported by the sixteen Panel Banks remained, on average, within a range of only 0.06 of a percentage point – tiny in relation to the average dollar Libor of 3.18%."

---

[8] "LIBOR Left in Limbo; A Call for More Reform," published in the North Carolina Banking Institute, Vol. 13, on February 22, 2009.

64.    Three independent academics reviewed Mollenkamp and Whitehouse's method-ology and findings.  All three found the Mollenkamp/Whitehouse approach to be reasonable.  According to one of these academics, Stanford University Professor Darrell Duffie, the narrow 0.06% range reported in three-month LIBOR rates "is far too similar to be believed."

65.    Mollenkamp and Whitehouse reported in the *WSJ* on how easily the Panel Banks could collude in arriving at their highly similar reported rates, noting:

> When posting rates to the BBA, the 16 panel banks don't operate in a vacuum. In the hours before the banks report their rates, their traders can phone brokers at firms such as Tullett Prebon PLC, ICAP PLC and Compagnie Financière Tradition to get estimates of where the brokers perceive the loan market to be.

66.    Moreover, each of the Defendants reported their LIBOR rates daily during the Class Period.  As rates were reported publicly, Defendants would know if any of their co-conspirators had broken from their agreement to depress LIBOR.

### (ii)    Panel Banks Report Inconsistent Rates Across Currencies.

67.    Panel Banks report Libor rates for different currencies each day.  Since the vari-ous Libor rates are a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of Panel Banks should largely be the same in the different currencies for which they report.  A comparison of reported Libor rates in different currencies showed this was not consistently so during the Class Period.

68.    Snider and Youle analyzed this phenomenon,[9] finding it common for pairs of banks that participate in multiple currency Libor panels to have different rank orderings in dif-ferent currencies.  For example, Defendants Bank of America and Mitsubishi both reported rates for U.S. Dollar LIBOR and YenLibor.  During the Class Period, it was common for Bank of

---

[9] "Does the LIBOR reflect banks' borrowing costs?," dated April 2, 2010.

America to report a lower rate than Mitsubishi in U.S. Dollar LIBOR, while at the same time reporting a higher rate in the Yen Libor.

69.    Since institutional risk should be the same for each Panel Bank regardless of what currency it is measured in, Snider and Youle found this practice to be evidence of manipulation. Specifically, they determined that independent market factors would have led to the banks' being in the same relative position in different currencies, because "most of the variables we would consider important for pricing debt either do not vary across banks, such as expectations for future inflation, or do not vary across currencies, such as the probability a given bank will default."

### (iii)    Bunching

70.    During the Class Period, the rates reported by certain Defendants "bunched" around the fourth lowest quote each day. That is to say that the rates reported by such Defendants were consistently near the fourth lowest of the sixteen Panel Banks. Since Reuters, at the time, calculated LIBOR by excluding the lowest (and highest) four reported rates every day, bunching around the fourth lowest rate is suggestive that such Defendants collectively acted and colluded to depress and manipulate LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of the LIBOR rates that day.

71.    The evidence regarding suspicious bunching practices was strongest for Bank of America, Citibank, and J.P. Morgan.

72.    Bunching among such Defendants' reported LIBOR rates demonstrates that these Defendants intended to report the same or similar rates. The individual variation between the financial condition of each reporting bank (discussed above) should reasonably have led to differences in the reported LIBOR rates. The fact that, during the Class Period, Defendants nevertheless repeatedly reported virtually identical rates to Reuters is evidence that these Defendants were conspiring to manipulate LIBOR.

19

73.    According to Snider and Youle, these Defendants' clustering of reported LIBOR rates at or near the fourth lowest rate ensured that the artificially low rates they reported would be included in the daily calculation, resulting in the artificial depression of LIBOR. As Snider and Youle found: "Banks with incentives to misreport will bunch around the pivotal fourth and twelfth lowest quotes while those with no such incentives will not."

74.    The following charts of daily U.S. Dollar LIBOR reported rates show the frequency with which Defendants Citigroup, Bank of America, and J.P. Morgan reported within a given percentage rate from the fourth lowest quote. A negative difference means that the reporting bank was below the fourth lowest quote, and therefore its rate was not included in the daily LIBOR calculation. Zero difference means that the Panel Bank was either the fourth lowest quote on a given day or tied at the same value as the fourth lowest quote.[10]



---

[10]    If there is a tie between LIBOR quotes on a given day, one of the banks' quotes, selected at random, is discarded.





75.   According to Snider and Youle, the fact that observed bunching occurred around the pivotal fourth lowest reported rate was reflective of the reporting banks' intention to ensure the lowest borrowing rates were included in the calculation of LIBOR by Reuters, (*i.e.*, beginning with the fifth lowest borrowing rate). Due to the mechanics of LIBOR calculation during the Class Period, the four lowest rates were always excluded. Therefore those Panel Banks that

bunched their reported LIBOR rates around the fourth lowest rate helped ensure the maximum downward manipulation of the resulting LIBOR rate. In addition, the fact that a Panel Bank reported one of the four lowest quotes (*i.e.*, quotes that were excluded by Reuters) did not mean that it was not also a member of the conspiracy.

76.   Further demonstrating the aberrant nature of the bunching around the fourth lowest reported rate, Snider and Youle also found that "the intraday distribution of *other* measures of bank borrowing costs do not exhibit this bunching pattern." (Emphasis added).

77.   Snider and Youle also reported that "using more recent data, we find evidence of misreporting is stronger in the period since markets have calmed somewhat from their recent upheaval," with "such clustering [having] been severe in the 3-Month U.S. Libor throughout 2009." (Emphasis added).

78.   Just as Snider and Youle's analyses of data in the post-August 2007 period, indicate that LIBOR manipulation continued "into 2009 and beyond," another academic study supports the conclusion that Defendants were reporting inaccurate and suspect LIBOR rates during 2006 and 2007 as well. For example, in her July 2010 study,[11] Professor Rosa M. Abrantes-Metz, then a Visiting Scholar at Leonard N. Stern School of Business, New York University, determined "that Benford's Law, a mathematical law commonly used to detect fraud in other contexts, was violated for the U.S. dollar Libor rate, most noticeably from early 2006 through the Summer of 2007."

(iv)   **The Sharp Increase in LIBOR following the April 16 *WSJ* Article**

79.   Further evidencing that the aberrant LIBOR rates were caused by the Defendants' own conduct and not external market forces, on April 17, 2008, the day after Mollenkamp's *WSJ*

---

[11] "The Power of Screens to Trigger Investigations."

article raised concerns about the intentionally manipulated and depressed reported rates, there

was a sudden jump in the U.S. dollar-denominated LIBOR.  For example, the benchmark dollar

rate for three-month borrowing hit 2.8175% on Thursday, April 17th, or about 8 basis points

more than the 2.7335% rate set on Wednesday, April 16th – a highly material one-day increase

that amounted to an extremely rare 5.53 standard deviation event.  The following chart from the

May 29, 2008 *WSJ* article demonstrates the material one day jump:



80.    Defendants caused the higher reported LIBOR rate on April 17, 2008 by submit-

ting materially higher rates than they had reported the day before.  For example, HBOS reported

a rate of 2.86% for a three-month loan, up 10 basis points from its prior day's reported rate, and

HSBC posted a rate of 2.85%, up 12 basis points from its previous day's quote.

81.    Further reflecting the manipulated nature of the U.S. Dollar LIBOR rates, report-

ed Libor rates for other currencies fell or remained relatively flat at the time the U.S. Dollar LI-

BOR surged, indicating that the U.S. Dollar LIBOR rate was susceptible to manipulation – and

in fact was being manipulated.

### III.   Defendants Had Significant Incentives to Manipulate LIBOR.

82.   In the run up to and during the height of the recent credit crisis, Defendants were loath to disclose the risk premium that the market was attaching to them.  To have disclosed that the market was charging any individual bank a much higher interest rate than other similarly situated banks would have drawn attention to the fact the first bank was perceived as being at greater risk of default than the others.  The Defendants had a collective desire to dissuade the market from perceiving Panel Banks as risky.

83.   In addition, the Defendants held significant financial positions in LIBOR-based derivatives, providing them incentive to depress LIBOR.  When LIBOR experienced a significant drop in the first quarter of 2009, Defendants reaped billions of dollars in profits.  It was no accident that Defendants experienced sharply increased profits in their Interest Rate Swap positions at the time LIBOR fell.  Defendants purposely took positions in Interest Rate Swaps, which benefited from their depression of LIBOR.

84.   As a result of these incentives Defendants' trading positions came to dominate their Libor reporting obligations.  A *Financial Times* article reports, for example, that Defendant Barclays is currently under investigation by the regulatory authorities of the United States and the United Kingdom for violating "Chinese Wall" rules which restrict information sharing between different parts of the bank.  Barclays' treasury department submits its daily borrowing costs to the BBA and is supposed to be walled-off from its traders.  Barclays is being investigated regarding communications between its traders and its treasury department which improperly influenced the daily submission process.

85.   In their April 2010 study, Snider and Youle posited that Defendants' exposure to LIBOR-related trading provided their chief incentive to manipulate the rate in a way that would

most benefit their portfolios. "Given the large notional values," the study said, "a small un-hedged exposure to the Libor can generate large incentives to alter the overall Libor." The au-thors supported their theory with an analysis of the clustering trends of rate submissions from two Defendants with high Libor exposure. "Here we see that Citigroup and Bank of America tend to submit quotes that are identical to the fourth lowest quote of the fifteen other banks ... . This is consistent with Bank of America and Citigroup having incentives, potentially stemming from their possession of Libor-indexed contracts, to lower the overall Libor rate ... ."

## IV.   Government Investigations

86.     The artificial LIBOR during the Class Period has spurred investigations by sever-al governmental regulatory agencies into the reporting practices of the Panel Banks beginning in 2006.

87.     The investigations were first publicly disclosed on March 15, 2011, when UBS revealed in its annual report that it had received subpoenas from the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and the De-partment of Justice ("DOJ"), as well as an information request from the Japanese Financial Supervisory Agency, relating to UBS's interest rate submissions to the BBA. UBS's disclo-sure states that the focus of the investigations is "whether there were improper attempts by UBS (among others), either acting on [its] own or together with others, to manipulate LIBOR at certain times."

88.     A *Financial Times* article published the same day as UBS's disclosure reported that the three U.S. agencies, the Japanese agency, and the United Kingdom's Financial Ser-vices Authority ("FSA") had also requested information from, and had begun interviewing wit-nesses connected to, the Defendants.

89.    Other Defendants have subsequently disclosed that they, too, are subject to investigation by regulatory authorities related to LIBOR.  On August 1, 2011, for example, HSBC released its 2011 Interim Results, and Barclays released its Half-Yearly Report in the United Kingdom, each disclosing that it was under investigation by various regulatory authorities around the world.  Barclays specifically identified investigations by the FSA, the CFTC, the SEC, the Fraud Section of the DOJ Criminal Division, the DOJ Antitrust Division, and the European Commission.

90.    On April 14, 2011, the *WSJ*, in an article entitled "U.S. Asks if Banks Colluded on Libor," reported that the SEC and DOJ were investigating whether "some of the world's biggest banks" "effectively formed a global cartel and coordinated how to report Libor borrowing costs."  The article stated that: "According to people familiar with the yearlong probe, U.S. regulators are focusing on Bank of America Corp., Citigroup Inc. and UBS, among others, and have sent subpoenas to those banks."

91.    On July 26, 2011, the *Financial Times* reported that investigators had expanded their probe to include yen-based Libor and the Tokyo interbank offered rate ("TIBOR").  In its results announcement made that day, UBS confirmed that the investigation's scope had widened and disclosed that UBS had received "conditional leniency and conditional immunity" from the DOJ for turning over information on the setting of yen-based Libor and of the TIBOR.  UBS said that while its immunity stretched to the yen-based Libor and the TIBOR, the deal did not bar the DOJ or other "government agencies from asserting other claims against us."  The Antitrust Division's leniency policies were established for corporations and individuals "reporting their illegal antitrust activity" and the policies protect leniency recipients from criminal conviction.  Notably, each of the Defendants was a member of the yen-based Libor panel from 2006 to 2009.

92.     According to the DOJ's corporate leniency policy, a company must confess its participation in a criminal antitrust violation to be eligible for leniency. Thus, before UBS was granted "conditional leniency and conditional immunity" from the DOJ, it first had to admit it committed the underlying antitrust wrongdoing.

93.     Latham & Watkins LLP has observed that the coordinated antitrust investigations in the United States, EU, UK, and Japan indicate that the enforcers are cooperating with each other and that the antitrust investigations may have been triggered by one of the banks taking advantage of the Antitrust Division's Corporate Leniency Policy, as well as other leniency policies around the globe.

94.     To date, defendants UBS, Bank of America, Citibank, and Barclays have received official subpoenas, but based on sources familiar with the investigations, the *Financial Times* reported that "[a]ll the panel members are believed to have received at least an informal request for information – an earlier stage in an investigation process before a subpoena."

95.     On September 7, 2011, the *Financial Times* further reported that U.S. investigators may charge bank executives with criminal violations of the Commodity Exchange Act that could result in prison sentences of up to 14 years. Along with criminal violations of transmitting false reports that affect the price of a commodity, U.S. investigators are also reported to be examining possible collusion between the banks' traders and treasury departments in 2007 and 2008.

96.     On February 3, 2012, *Bloomberg* reported that UBS AG, Credit Suisse Group AG, Bank of Tokyo-Mitsubishi UFJ Ltd., Citigroup Inc., Deutsche Bank AG, HSBC Holdings Plc, J.P. Morgan Chase & Co., Mizuho Financial Group Inc., Rabobank International, Royal Bank of Scotland Group Plc, Societe Generale SA and Sumitomo Mitsui Banking Corp. "are fac-

ing a Swiss inquest into possible manipulation of the London interbank rate, the latest probe into how the benchmark for $350 trillion of financial products is set." Comco, the Swiss competition regulatory body, reported in an email statement that: "Collusion between derivative traders might have influenced" Libor and its Japanese equivalent, Tibor. ... Market conditions regarding derivative products based on these reference rates might have been manipulated." According to *Bloomberg*, "Comco said it opened the investigation after receiving an application for its 'leniency program,' which indicated that traders from various banks might have influenced the rate."

97.     Further allegations regarding Panel Bank efforts to illegally manipulate Libor rates have come to light through a wrongful termination action filed in the Singapore High Court in 2011 by a former RBS trader. The *Financial Times* reported on February 3, 2012 that Tan Chi Min, the former head of delta trading for RBS's global banking and markets division in Singapore, alleged in court filings that his termination was the result of "sham disciplinary proceedings" undertaken by RBS to make scapegoats of individual employees when regulators investigated possible manipulation of Libor. Specifically, Tan alleged that after regulators launched their probe, RBS's "consequent internal investigations were intended to create the impression that such conduct was the conduct not of the defendant [RBS] itself but the conduct of specific employees who the defendant has sought to make scapegoats through summary dismissals."

98.     Tan further claims that it was his responsibility to provide input to RBS's rate settlers and that it was common practice for other bank employees to make requests of them as well. Tan described these as "requests to have the defendant's submitted Libor rate set at a particular level in order to maximise [sic] profits" and alleged that RBS "was fully aware of this, condoned such conduct and waived any right to terminate employees on the basis of it."

## DEFENDANTS' UNDERWRITING OF LIBOR-BASED DEBT SECURITIES DURING THE CLASS PERIOD

99.     Defendants, exclusively or with others, acted as underwriters of the Relevant LI-BOR-Based Debt Securities.  In their role as underwriters, Defendants were responsible for, *inter alia*, initially purchasing the debt securities from their issuers, and then re-selling the securities in private or public transactions.

100.    As underwriters of the Relevant LIBOR-Based Debt Securities, Defendants were intimately familiar with all major terms and conditions of the Relevant LIBOR-Based Debt Securities, including the fact that the interest rates to be paid on the securities were directly tied to the U.S. Dollar LIBOR rate.

## INTERSTATE COMMERCE AND ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

101.    An essential component in the pricing of debt transactions is the interest rate to be paid.

102.    At all relevant times, LIBOR was a key benchmark for determining the applicable interest rate, and hence the pricing, of debt transactions in the United States.

103.    On information and belief, many tens of millions of dollars of debt transactions are entered into each year in interstate commerce in the United States.

104.    On information and belief, tens of millions of dollars of interest, determined by reference to LIBOR as the benchmark, are paid each year in interstate commerce in the United States.

105.    By depressing LIBOR rates, Defendants effectively reduced the amount of interest paid each year on debt obligations in interstate commerce in the United States.

106.    Thus, Defendants' unlawful conduct had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

107.   At all relevant times, Defendants knew that LIBOR was and is a key benchmark for determining the applicable interest rate, and hence the pricing, of debt transactions in the United States and that, by depressing LIBOR rates, Defendants would effectively reduce the amount of interest paid on debt obligations in the United States.

108.   Indeed, both before and during the Class Period, Defendants underwrote millions of dollars' worth of Relevant LIBOR-Based Debt Securities, knowing that such securities had been or would be sold in interstate commerce in the United States and the interest payments thereunder would be made in interstate commerce.

109.   By conspiring to depress the U.S. Dollar LIBOR rates, Defendants focused specifically upon the U.S. Dollar LIBOR rates, thus intentionally targeting their unlawful conduct to affect commerce, including interstate commerce, within the United States.

110.   Defendants' unlawful conduct had a direct and adverse impact on competition in the United States in that, absent Defendants' collusion, LIBOR rates would have been higher, more money would have been paid as interest in U.S. interstate commerce, and Plaintiff and other members of the Class who owned Relevant LIBOR-Based Debt Securities during the Class Period would have earned more interest on those debt securities.

111.   As a direct result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

112.   By its nature, Defendants' unlawful activity alleged herein was self-concealing. The Defendants, *inter alia*, falsely reported interest rate information to the BBA and Reuters in order to depress U. S. Dollar LIBOR to artificially low levels.

113.    Analysts offered various reasons in 2008 to explain the divergence of reported LIBOR rates and other market indices such as default insurance rates. For example, the freezing up of the credit markets during the financial crisis, and the resultant dearth of lending by banks, even to each other, could support the erratic and suspicious borrowing rates these banks reported.

114.    At the time of the financial crisis in 2008, representatives of the Defendants said they provided accurate rates. In addition, industry groups with connections to the Defendants, including the BBA, which is responsible for reported Libor rates, similarly attempted to refute assertions that Panel Banks were falsely reporting interest rate information to depress LIBOR.

115.    During 2008, for example, the BBA stated that LIBOR was reliable, and that the financial crisis had caused many indicators to act in unusual ways. A spokesman for the BBA stated that there was "no indication" that the default insurance market provided a more accurate picture of banks' borrowing costs than that provided by LIBOR.

116.    The truth did not begin to become public until March 15, 2011, when UBS released its annual report stating that it had received subpoenas from the DOJ, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA. UBS described the focus of the investigation as "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times." As described above, other information regarding these investigations has become public only since the UBS revelation.

117.    In further contrast to its earlier statements that LIBOR was reliable, in February 2011 the BBA expanded the panel of banks that contribute to U.S. Dollar LIBOR from sixteen to twenty members.

118.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until the government investigations became public on or after March 15, 2011.

119.    Because the Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of their illegal conduct, Plaintiff and the Class could not in the exercise of reasonable diligence have discovered the existence of Defendants' unlawful conduct any earlier than UBS's public disclosure on March 15, 2011.

120.    Due to the Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled until March 15, 2011.

121.    The Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run.

## CLASS ACTION ALLEGATIONS

122.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and all others who owned (including beneficially in "street name") any of the Relevant LIBOR-Based Debt Securities during the Class Period.

123.    The Class is so numerous that the joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members who suffered injury, *inter alia*, by receiving less interest pursuant to their Relevant LIBOR-Based Debt Securities during the Class Period.

124.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of law as alleged herein. Defendants' wrongful conduct in violation of the antitrust laws directly caused the injuries and damages of each member of the Class.

125.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

126.    Common questions of law and fact exist as to all members of the Class, which common questions predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants conspired with others to depress artificially U.S. Dollar LI-BOR rates in violation of the Sherman Act;

b.    whether Defendants' conduct had an anticompetitive and manipulative effect on LIBOR during the Class Period;

c.    whether Defendants' conduct had a direct, substantial, reasonably foreseeable, and adverse impact upon interstate commerce in the United States during the Class Period;

d.    whether Defendants' conduct depressed the amounts of interest Plaintiff and the members of the Class earned on their Relevant LIBOR-Based Debt Securities during the Class Period; and

e.    the appropriate measure of damages for the injury sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

127.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon

the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, will achieve substantial economies of time, effort, and expense, and will assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

128.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through a representative is not objectionable. The amounts at stake for individual Class members, while substantial in the aggregate, are not necessarily great enough to enable each of them to maintain a separate suit against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

**COUNT ONE**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

129.     Plaintiff incorporates by reference and realleges the preceding allegations, as though fully set forth herein.

130.     The Defendants and their unnamed co-conspirators entered into and engaged in a continuing conspiracy in unreasonable restraint of interstate trade and commerce in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.     During the Class Period, the Defendants combined, conspired, and agreed to fix, maintain, and depress the U.S. dollar LIBOR rates. Through their positions on the U.S. dollar LIBOR panel, Defendants could and did control what LIBOR rate would be reported, and thus controlled the amounts of interest paid on the Relevant LIBOR-Based Debt Securities underwritten by them.

132.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, depressed and stabilized LIBOR, a key component in determining the price of debt, and thus the amounts of interest paid on Relevant LIBOR-Based Debt Securities. Accordingly, Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

133.    Defendants' conspiracy, and resulting impact on the amounts of interest paid on Relevant LIBOR-Based Debt Securities, occurred in or affected interstate commerce.

134.    As a direct, reasonably foreseeable, and substantial result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

135.    Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## RELIEF SOUGHT

Accordingly, Plaintiff demands judgment against Defendants and each of them as follows:

A.    Determining that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, with Plaintiff as class representative and Plaintiff's counsel as counsel for the Class;

B.    Adjudging that Defendants have violated Section 1 of the Sherman Act;

C.    Awarding to Plaintiff and the Class three-fold the damages to be proved at trial;

E.    Awarding to Plaintiff and the Class their costs of the suit, including reasonable attorneys' fees; and

F.    Affording to Plaintiff and the Class such other and further relief as may be just and proper.

35

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues triable by a jury.

Dated: February 8, 2012

Karen L. Morris (Bar No. 1939701)
Patrick F. Morris
R. Michael Lindsey
MORRIS AND MORRIS LLC
   COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE  19807
Tele: (302) 426-0400
Fax:  (302) 426-0406
Email: kmorris@morrisandmorrislaw.com
          pmorris@morrisandmorrislaw.com
          rmlindsey@morrisandmorrislaw.com


David H. Weinstein
Steven A. Asher
Jeremy S. Spiegel
WEINSTEIN KITCHENOFF & ASHER LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Tele: (215) 545-6535
Fax:  (215) 545-6535
Email: weinstein@wka-law.com
          asher@wka-law.com
          spiegel@wka-law.com

36